No. 20-3202

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

LATRINA COTHRON,
individually and on behalf of all others similarly situated,
*Plaintiff-Appellee*

v.

WHITE CASTLE SYSTEM, INC.,
*Defendant-Appellant*

Question of Law Certified by the United States District Court of Appeals for the Seventh Circuit,
Case No. 20-3202

Question of Law ACCEPTED on December 23, 2021 under Supreme Court Rule 20

On appeal from the United States District Court for the Northern District of Illinois under 28 U.S.C.
§ 1292(b), Case No. 19CV00382
The Honorable Judge John J. Tharp Presiding

# CIRCUIT RULE 52(b) STATEMENT OF POSITION OF
# DEFENDANT-APPELLANT WHITE CASTLE SYSTEM, INC.

Melissa A. Siebert
Erin Bolan Hines
COZEN O'CONNOR
123 N. Wacker Dr., 18th Floor
Chicago, IL  60606
Tel.: (312) 382-3100
Fax: (312) 382-8910
Email:  msiebert@cozen.com
        ebolanhines@cozen.com
*Counsel for White Castle System, Inc.*

## INTRODUCTION

On February 17, 2023, the Illinois Supreme Court issued an opinion in *Cothron v. White Castle System, Inc.*, -- N.E.3d --, 2023 IL 128004, answering the question this Court certified regarding claim accrual under Illinois' Biometric Information Privacy Act (the "Privacy Act"), 740 ILCS 14/1 *et seq. See* Dkt. 74-76. Pursuant to Seventh Circuit Rule 52(b), Defendant-Appellant White Castle System, Inc. ("White Castle") submits its statement of position regarding what action ought to be taken by the Court.

## POSITION

The Illinois Supreme Court has yet to issue the "mandate of the reviewing court," which it will do "not earlier than 35 days after the entry of judgment unless the court orders otherwise." Ill. S. Ct. R. 368(a). A timely filing of a petition for rehearing "will stay the mandate until disposition of the petition unless otherwise ordered by the court." *Id.*

On March 10, 2023, White Castle timely filed a Petition for Rehearing. *See* Ex. A. The Illinois Supreme Court's mandate is thus stayed pending resolution of the Petition and the appeal remains

pending. White Castle, therefore, respectfully makes two requests of this Court.

First, White Castle requests that the Court refrain from further action in this matter until the Illinois Supreme Court resolves its Petition for Rehearing.

Second, White Castle requests that the Court order the filing of a subsequent Circuit Rule 52(b) statement of position once the Illinois Supreme Court resolves the Petition for Rehearing or, alternatively, order supplemental briefing on any issues that remain to be decided following resolution of the Petition.

## CONCLUSION

White Castle respectfully requests that the Court refrain from further action until the Illinois Supreme Court resolves its Petition for Rehearing and, upon resolution of the Petition, order the filing of additional Rule 52(b) statements of position or supplemental briefing on any remaining issues.

Dated: March 10, 2023          WHITE CASTLE SYSTEM, INC.

                              */s/ Melissa A. Siebert*
                              Melissa A. Siebert

Melissa A. Siebert
Erin Bolan Hines
COZEN O'CONNOR
123 N. Wacker Dr., 18th Floor
Chicago, IL  60606
Tel.: (312) 382-3100
Fax: (312) 382-8910
Email:  msiebert@cozen.com
ebolanhines@cozen.com
Counsel for White Castle System, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Melissa A. Siebert*

# EXHIBIT A

## No. 128004

# In the
# Supreme Court of Illinois

LATRINA COTHRON,

*Plaintiff-Appellee,*

v.

WHITE CASTLE SYSTEM, INC.,

*Defendant-Appellant.*

_____

Question of Law Certified by the United States District Court of Appeals
for the Seventh Circuit, Case No. 20-3202

Question of Law ACCEPTED on December 23, 2021 under Supreme Court Rule 20

On Appeal from the United States District Court for the Northern District of Illinois under
28 U.S.C. § 1292(b), Case No. 19 CV 00382
The Honorable John J. Tharp, Judge Presiding.

## PETITION FOR REHEARING

MELISSA A. SIEBERT
ERIN BOLAN HINES
COZEN O'CONNOR
123 North Wacker Drive
18th Floor
Chicago, Illinois 60606
(312) 382-3100
msiebert@cozen.com
ebolanhines@cozen.com

*Counsel for Defendant-Appellant
White Castle System, Inc.*

E-FILED
3/10/2023 12:29 PM
CYNTHIA A. GRANT
SUPREME COURT CLERK

 

## **INTRODUCTION**

Defendant-Appellant White Castle System, Inc. ("White Castle") petitions the Court for a rehearing, including new oral argument, in this Illinois Supreme Court Rule 20(a) appeal of a certified question from the United States Court of Appeals for the Seventh Circuit.[1]

Pursuant to Illinois Supreme Court Rule 367, White Castle respectfully requests that the Court reconsider three points that were overlooked or misapprehended in the Opinion. Ill. Sup. Ct. R. 367(b) (eff. Nov. 1, 2017).[2]

*First*, the Opinion overlooks fundamental and undisputed facts in the record about the biometric technology at issue, and thus misapprehends how biometric technology works. The record before the Court makes clear that since 2004, every scan of Plaintiff's alleged biometric identifier has been a "subsequent authentication scan," which simply compared a new finger scan against what was already in the database to authenticate Plaintiff. *See* Section I *infra*. There was no new loss of "secrecy" or control over biometric data with each subsequent authentication scan, and thus no additional aggrievement.

---

[1] White Castle appreciates that four of the seven Justices did not have the benefit of oral argument where they could have asked questions or requested further briefing to address any of their concerns. This is all the more reason to order a rehearing and reconsideration.

[2] As used herein, "Opinion" refers to the majority opinion of the Court in this appeal, which begins on Paragraph 1, and "Dissent" refers to the opinion of Justice Overstreet, which begins on Paragraph 47. *See Cothron v. White Castle Sys., Inc.*, 2023 IL 128004.

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

*West Bend Mut. Ins. Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, ¶ 46.

Indeed, as the Dissent recognized, the Court's own Privacy Act cases do not support the Opinion's conclusion. *See* Dissent ¶ 53. The Privacy Act codifies a secrecy interest in biometric data. *West Bend*, 2021 IL 125978, ¶ 46. Secrecy is destroyed at the point of "the lost opportunity" to withhold informed consent. *McDonald v. Symphony Bronzeville Park, LLC*, 2022 IL 126511, ¶ 43 (citing *Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186, ¶ 34). At that point a "precise harm" occurs, the Privacy Act right "vanishes into thin air," and the claim accrues. *Rosenbach*, 2019 IL 123186, ¶ 33-34. Injury cannot therefore recur absent a new loss of secrecy, which did not occur here. *See* Dissent ¶ 53.

*Second*, the Opinion's statements about damages under the Privacy Act overlook and misapprehend the Court's precedent, principles of constitutional avoidance, and the plain language of the Privacy Act—specifically, the private right of action, liquidated damages, and fee-shifting provisions in Privacy Act Section 20. Given the astronomical damages regime the Opinion contemplates, a fresh look is warranted.

*Third*, the Opinion overlooks the clear constitutional consequences of its construction of the Privacy Act. The Opinion notes that damages "appear[]" to be "discretionary" (Opinion ¶ 42), but without guidance or clarification, the Act is rendered unconstitutionally vague. Judges and juries are permitted to set

2

Privacy Act damages on an *ad hoc* basis with no guiding standards, causing constant uncertainty borne from the looming potential for ruinous damages. At minimum, White Castle respectfully requests that the Court grant rehearing to clarify paragraphs 40 through 43 of the Opinion and provide guidance on how Privacy Act damages should be calculated.

## **ARGUMENT**

### I.     **The Opinion Is Irreconcilable With the Record.**

White Castle's position is, and always has been, that collection and disclosure occur only when an entity first collects or discloses purported biometric information. This makes sense because of the way biometric data systems work.

*First*, a user "enrolls" or "registers" in the system by providing a physical characteristic like a fingertip, which is scanned and converted to a template. That template is then assigned to the user and stored in a database. *Subsequently*, in the matching stage, the user provides the same, previously scanned physical characteristic (*e.g.* their fingertip scan), which is transmitted to the biometric system and compared to the information already stored there to verify that the user is who they claim to be. To use the Opinion's terminology, the scan at the matching stage is a "subsequent authentication scan." Opinion ¶ 23. There is no new loss of control, privacy or secrecy in these subsequent authentication scans, and thus no actionable, additional aggrievement. Dissent ¶ 53.

3

This fundamental understanding of how the technology works is not disputed, and is supported by the record, including:

- The original complaint filed in this matter asserts that Plaintiff enrolled in a finger-scan system as a "means of authentication" and she subsequently scanned her finger each time she accessed a White Castle computer. (R1, at 1-2 ¶¶ 2, 5; R1, Ex. 1, at 9-10, ¶¶ 42-44, at 12, ¶¶ 56-60.)[3]

- The operative complaint in this matter, which states Cothron scanned and registered her finger so White Castle could subsequently use it as an authentication method for computer and paystub access. (R44, ¶ 40.)

- The presentation of the facts by both sides in this appeal. Reply Br. at 23-24 ("Subsequent scans merely compare a new scan to previously collected data."); Cothron Br. at 4 (White Castle repeated same verification conduct for "at least ten years" with respect to Cothron's finger scans.).

Below, we discuss how overlooking these facts led to the errors that the Court can correct upon rehearing.

---

[3] All "R__" citations refer to documents on the federal district court docket that are not included in White Castle's Opening Brief Appendix. For example, R1 refers to Docket Entry No. 1.

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

### A. Every Scan After Cothron's First Scan Was a "Subsequent Authentication Scan."

White Castle's position is that after Cothron enrolled in the finger-scan technology in 2004, every subsequent use must be considered a "subsequent authentication scan." In the Opinion, however, the majority stated that Cothron's ongoing use of the technology was "belied by the position White Castle took below." Opinion ¶ 23. As set forth below, this statement reflects a misunderstanding of the record, which clearly impacted the Opinion's reasoning. A rehearing is therefore warranted.

Cothron was a Chicago-based White Castle employee from 2004 until 2022. (R118 at 23-24, ¶¶ 2-9.)[4] Within her first few months of employment, she began using White Castle's consent-based finger-scan system. (*Id.* at 24, ¶ 6.)[5] The record therefore demonstrates that Cothron first enrolled in the system in 2004. From that point forward, every use of the system by her was a "subsequent authentication scan."

The Privacy Act was enacted in 2008. Until then, Illinois law did not require consent for the collection or disclosure of biometric information. Thus, Cothron could not have brought a claim until 2008. It is for this reason White Castle has taken the position that no injury could have occurred until 2008; no collection or disclosure regulated by the Act could have occurred until then.

---

[4] Cothron's end-of-work date is not in the record but she no longer works for White Castle as of the filing of this Petition.

[5] Although Cothron first consented to use the system in 2004, that consent is not directly at issue in this appeal. *Id.*

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

The fact remains that every use of the system by Cothron after her enrollment in 2004 was a subsequent authentication scan.

The Opinion states that White Castle took a different position before this Court than it took below regarding whether a subsequent authentication scan is a "collection" or "capture" under the Privacy Act. Opinion ¶ 23. That is a misapprehension. White Castle has never conceded that a subsequent authentication scan is a "collection" or "capture," nor has White Castle ever conceded that Plaintiff's first subsequent authentication scan in 2008 gave rise to a Privacy Act claim. White Castle has argued only that scans before 2008 could not have given rise to a Privacy Act claim because the Act did not yet exist. Therefore, White Castle has been consistent in its argument that Cothron's claim accrued "if ever" or "if at all" upon her first use of the technology after the Act's enactment in 2008. *See* Opening Br. at 8, 12, 21; (R120 at 7.)

> **B.    A "Subsequent Authentication Scan" Does Not Result in a New Invasion or a New Injury, Because It Results in No Loss of Secrecy.**

As Justice Neville wrote for a unanimous Court in the *West Bend* case, the Act "protects a *secrecy interest*—here, the right of an individual to keep his or her personal identifying information like fingerprints secret." 2021 IL 125978, ¶ 46 (emphasis added). Discussing claims under Section 15(d) of the Privacy Act, the Court explained that "disclosing a person's biometric identifiers or information without his or her consent or knowledge necessarily violates that person's right to privacy in biometric information." *Id.* Once

6

biometric data is allegedly obtained by or disclosed to a third party, the individual's "right to keep certain information confidential" is violated, and that information's "secrecy" is lost. *Id.* ¶ 45; Dissent ¶¶ 50, 53 ("[T]his court stated that the Act 'protects a secrecy interest,'" and control is lost "upon the first scan." (quoting *West Bend*, 2021 IL 125978, ¶ 46)); *see also McDonald v. Symphony Bronzeville Park, LLC*, 2022 IL 126511, ¶ 43 (Section 15(b) claim "seeks redress for the lost opportunity 'to say no by withholding consent.'" (quoting *Rosenbach*, 2019 IL 123186, ¶ 34)).

As they are bound by this Court's precedent, the Appellate Court and federal courts sitting in diversity jurisdiction have adopted, relied upon, and built upon this reasoning. For example, in the recent case of *Barnett v. Apple Inc.*, the Appellate Court affirmed the dismissal of Privacy Act claims against Apple where the plaintiffs pled that Apple designed the purported biometric technology to store biometrics on the users' own devices. 2022 IL App (1st) 220187, ¶¶ 1-3. Applying the plain meaning of the terms "possession" and "collect," the Appellate Court found Apple did not have sufficient "control" over the data to be subject to the Privacy Act. *Id.* ¶¶ 42-44, 55. Rather, the plaintiffs retained control at all times: "it is the user herself who utilizes these tools to capture her own biometric information." *Id.* ¶ 44. Since the plaintiffs never lost control of their data, there was no violation of the Act. *Id.* ¶¶ 42-44, 55; *see also Johnson v. NCR Corp.*, No. 22 C 3061, 2023 WL 1779774, at *2 (N.D. Ill. Feb. 6, 2023) ("Because BIPA does not include a definition for 'possession'

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

. . . courts have looked to the term's 'popularly understood' or 'settled legal' meaning of exercising dominion or control." (citing *Rosenbach*, 2019 IL 123186, ¶29; *Barnett*, 2022 IL App (1st) 220187, ¶¶42; 740 Ill. Comp. Stat. 14/10; and federal district court cases)).

Respectfully, the Court's Opinion materially deviates from the animating reasoning of *West Bend*, *Rosenbach*, *McDonald*, and their progeny. Most notably, the Opinion converts the injury under the Act from an invasion of an individual's "secrecy interest" in—and "control" over—their purported biometrics into a purely procedural statutory violation. These are mutually exclusive categories. On the one hand, secrecy cannot be recreated. Once it is lost, it cannot be lost again. On the other hand, a procedural failure can happen over and over again. By ruling that an individual providing a single biometric datum to a single employer may nonetheless be "aggrieved" thousands of times under the Act, the Court effectively set aside its recent precedent to hold a procedural violation, and not the loss of secrecy and control, to be the accruing injury under the Act.

This same deviation from established precedent can be seen in the Opinion's conflation of the initial enrollment and each subsequent authentication scan. Initial enrollment results in either a "biometric identifier" or "biometric information" being associated with an individual in some manner and stored in a database for the purpose of authenticating the individual going forward. As discussed in *West Bend* and *Rosenbach*, initial

8

enrollment is the point at which the privacy associated with the information is lost pursuant to the statute and the injury is complete. *See West Bend*, 2021 IL 125978, ¶ 46; *Rosenbach*, 2019 IL 123186, ¶ 34.

In contrast, subsequent authentication scans merely compare an anonymous scan with information previously collected upon enrollment. If a "match" is found, the user may access the system. If there is no match, the scan remains anonymous. No new or additional biometrics are "collected" and secrecy is maintained.

This makes sense. Secrecy cannot be recreated—a bell cannot be "un-rung." A subsequent authentication scan thus cannot result in a further loss of secrecy. Here, the user simply provides the same data as before to verify that she is who she claims to be (or a non-user submitting data that never matches at all, and thus stays anonymous). Dissent ¶ 53 (There is no additional loss of control "whether the same finger is scanned a few times or one million times. The individual loses control over it only once."). The Court should reconsider on this basis alone—Plaintiff's post-2004 scans resulted in no loss of secrecy and, thus, no injury. The best way to correct this misapprehension would be to grant White Castle a rehearing and the opportunity to answer the Court's questions.

## II. The Opinion Misapprehends the Statutory Text of the Act's Private Right of Action and Damages Provisions and Untethers Them From Illinois Law.

Through its appeal, White Castle asked the Court to consider the Act's text and the legislature's intent. And, indeed, the Opinion notes that the

9

legislature did not appear to authorize damages awards "that would result in the financial destruction of a business." Opinion ¶ 42. The Court should have taken that finding into account when considering the legislature's provision of a private right of action and liquidated damages. *See* Dissent ¶ 62 (The Court was "asked to determine legislative intent by considering the consequences of construing the statute one way or another."); *id.* ¶ 59 (a construction that leads to an "absurd result must be avoided").

Further, the Opinion recognizes that its claim accrual holding could result in "harsh, unjust, absurd or unwise" damages awards. Opinion ¶ 40 (internal quotation marks omitted). Such awards could include the *$17.1 billion* White Castle estimated it could owe under a "per-scan damages" theory. Opening Br. at 45. The Opinion acknowledges the crushing liability its holding generates, but it deems the damages problem a "policy" issue that must be resolved by the General Assembly and via discretion to the lower courts. *See* Opinion ¶ 43.

Respectfully, the General Assembly has already resolved this "policy" issue by clearly signaling its intent that damages under the Act should not accumulate on a per-scan basis. The General Assembly did so by incorporating important features into the private right of action that the Opinion either overlooked or misconstrued. Indeed, Section 20 of the Act demonstrates that the legislature intended for an individual plaintiff engaged in a single course of contact with a single defendant—such as employee timekeeping or unlocking

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

a phone or laptop—to have a single claim per subsection of the statute, not

thousands.

Section 20 of the Privacy Act compels this conclusion, as it provides in

full:

> Sec. 20.  Right of action.  Any person *aggrieved by a violation* of this Act shall have a right of action in a State circuit court or as a supplemental claim in federal district court against an offending party.  A prevailing party may recover for each violation:
>
> (1) against a private entity that negligently violates a provision of this Act, *liquidated damages* of $1,000 or actual damages, whichever is greater;
>
> (2) against a private entity that intentionally or recklessly violates a provision of this Act, *liquidated damages* of $5,000 or actual damages, whichever is greater;
>
> (3) *reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses*; and
>
> (4) other relief, including an injunction, as the State or federal court may deem appropriate.

740 ILCS 14/20 (emphasis added).

The General Assembly showed its intent in this plain text in three

important ways.  First, by requiring aggrievement as a threshold requirement

to bring a claim, the legislature again expressly tied the right to bring a claim,

and the ability to recover, to the plaintiff's injury—i.e., the one-time loss of

secrecy in and control over one's information.  Second, by providing for

"liquidated damages," the General Assembly made clear its choice that a

recovery must be a reasonable approximation of the plaintiff's damages.  Third,

by providing for the award of attorneys' fees, costs, expert witness fees, and

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

litigation expenses, the General Assembly sent a clear signal that individual damages would likely be small, and that fee-shifting would be necessary to incentivize enforcement.

### A. The Opinion Writes the Term "Aggrieved" Out of the Act, Which Is Contrary to the Plain Text of the Act and to *Rosenbach*.

The Opinion holds that "the statutory violation itself is the 'injury' for purposes of a claim under the Act" and that all the court need consider is "whether a statutory provision was violated." Opinion ¶¶ 38-39 (citations omitted). These statements cannot be squared with either *Rosenbach* or the statutory text. *Rosenbach* clearly stood for the proposition that a plaintiff must allege a "violation of his or her rights under the Act in order to qualify as an 'aggrieved' person." 2019 IL 123186, ¶ 40. *Rosenbach* also drew a clear distinction between the privacy rights protected by the Act and the procedural safeguards (policy, notice and consent requirements) provided by the Act to protect those rights. *Id.* ¶¶ 33-34. By treating the privacy right and the procedural safeguards as one and the same, the Opinion misconstrues *Rosenbach*, if not overruling it entirely.

Under the plain language of the Privacy Act, only a "person aggrieved by a violation" has a claim. 740 ILCS 14/20. In *Rosenbach*, the Court considered what it means to be "aggrieved" under the Act, after the defendant argued the plaintiff was not aggrieved because he "suffered no actual or threatened injury." 2019 IL 123186, ¶ 12. *Rosenbach* rejected the argument, explaining that aggrievement includes "having legal rights that are adversely

12

affected." *Id.* ¶ 32 (quoting Black's Law Dictionary 77 (9th ed. 2009)). *Rosenbach* then explained that "through the Act, our General Assembly has codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information." *Id.* ¶ 33. According to *Rosenbach*, because an initial collection of biometric identifiers or biometric information from an individual causes a loss of control, unless the Act's procedural safeguards are followed, a claim arises upon that first collection, regardless of whether any additional injury is pleaded or proved. *Id.* ¶ 34.

While answering the certified question here, the Opinion abrogates *Rosenbach,* by confusing the statutory right that the General Assembly created—the right of privacy in and control over biometric identifiers and biometric information—with the prophylactic "safeguards" that the Act creates to protect that right. The Opinion states that "*Rosenbach* clearly recognizes the statutory violation itself is the 'injury' for purposes of a claim under the Act." Opinion ¶ 38. To the contrary, *Rosenbach* repeatedly stated that the injury at issue was the loss of the *right* to privacy in and control over biometric identifiers and biometric information. 2019 IL 123186, ¶¶ 33-38.

> The Act vests in individuals and customers *the right to control their biometric information* by requiring notice before collection and giving them the power to say no by withholding consent. *These procedural protections* "are particularly crucial in our digital world because technology now permits the wholesale collection and storage of an individual's unique biometric identifiers—identifiers that cannot be changed if compromised or misused." When a private entity fails to adhere to the *statutory procedures*, as defendants are alleged to have done here, "*the right of the individual to maintain [his or] her biometric privacy*

13

> *vanishes into thin air*.  The precise harm the Illinois legislature
> sought to prevent is then realized."

*Rosenbach*, 2019 IL 123186, ¶ 34 (emphasis added) (alteration in original) (citation omitted); Dissent ¶ 53 ("the 'precise harm' the legislature was addressing was an individual's loss of the right to maintain biometric privacy" (quoting *Rosenbach*, 2019 IL 123186, ¶¶33-34)).  The injury associated with a Privacy Act claim is not the failure to provide the procedural protections provided by the Act, but the resulting loss of the *right* to maintain biometric privacy.  *Rosenbach*, 2019 IL 123186, ¶ 36 (discussing the "safeguards" supplied by the Act).  Accordingly, it is not the failure to provide the protections, but the "violation of [the plaintiff's] rights under the Act" that make a plaintiff "qualify as an 'aggrieved' person and be entitled to seek liquidated damages and injunctive relief pursuant to the Act."  *Id.* ¶ 40.

Moreover, the Opinion eliminates the important term "aggrieved" from the Act.  The Opinion holds that a statutory private right of action provision that states "any person *aggrieved by a violation* of this Act shall have a right of action" (740 ILCS 14/20 (emphasis added)) actually means that any person who experiences a violation of the Act shall have a right of action.  In *Rosenbach*, the Court took great care in explaining how the statutory violation before it *caused*, but was not itself, an aggrievement under the Act by impairing statutory privacy rights.  The Opinion here undoes this carefully considered precedent by holding that any technical violation of the statute in and of itself raises a claim.  Reconsideration is warranted on this basis.

14

**B.    The General Assembly's Choice to Allow "Liquidated Damages" is a Textual Argument the Court Should Consider.**

In the course of conducting a "textual analysis" of when a claim accrues and its necessary impact on damages, the Court must look to and consider the text of Section 20. While the Opinion characterizes liquidated damages as a "nontextual argument," (Opinion ¶¶ 32, 40), respectfully, arguments premised on statutory language and the General Assembly's word choice are in fact textual arguments. *See State Bank of Cherry v. CGB Enters., Inc.*, 2013 IL 113836, ¶ 56 (approving the Eighth Circuit's "detailed textual analysis" of a statute, as "the primary objective of statutory construction is to give effect to the intent of the legislature, and the most reliable indicator of intent is the statutory language itself").

First, the Court overlooked the significance of the General Assembly's choice to have the Act provide for awards of "liquidated damages" within the Act's greater context. *See* 740 ILCS 4/20. Most notably, the requirement that a person be "aggrieved," discussed above, is in harmony with the fact that the Act also provides for liquidated damages. To be aggrieved is to be harmed, and liquidated damages are intended to approximate harm. *See, e.g.*, *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 863 (7th Cir. 2020) (under Illinois law, "liquidated damages" refer to a reasonable estimate of harm that "bear[s] some relation to the damages that might occur"); Black's Law Dictionary, "Damages" (11th ed. 2019) (defining "liquidated damages" in contrast to a "penalty" as a "reasonable estimation of actual damages"). Liquidated damages would be

15

inappropriate and excessive if provided to a plaintiff not aggrieved by a violation.

Second, the meaning of the General Assembly's choice to have the Act provide liquidated damages is both extremely significant and well settled. Existing law is crystal clear that liquidated damages are intended to be a reasonable approximation of actual damages when actual damages would be small, uncertain, or hard to quantify. Liquidated damages arise out of contract law. Black's Law Dictionary[6] defines them as: "An amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches." Black's Law Dictionary, "liquidated damages" (11th ed. 2019). In contrast, Black's defines "statutory penalty" as "a penalty imposed for a statutory violation; esp., a penalty imposing automatic liability on a wrongdoer for violation of a statute's terms without reference to any actual damages suffered." Black's Law Dictionary, "statutory penalty" (11th ed. 2019). Black's also provides tools for distinguishing a liquidated damage from a penalty and explains when the damages amount is "far in excess of the probable damage on breach, it is almost certainly a penalty." Black's Law Dictionary, "liquidated damages" (11th ed. 2019).

---

[6] The Court "may consult [dictionaries] when, as here, attempting to ascertain the plan and ordinary meaning of a statutory term where the term has not been specifically defined by the legislature." *Rosenbach*, 2019 IL 123186, ¶ 32 (consulting both Black's Law Dictionary 77 (9th ed. 2009) and Merriam-Webster's Collegiate Dictionary 25 (11th ed. 2006) for the definition of "aggrieved").

16

The difference between "liquidated damages" and penalties also is discussed in the Restatement (Second) of Contracts:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonable large liquidated damages is unenforceable on grounds of public policy as a penalty.

Restatement (Second) of Contracts § 356(1) (1979).[7]

Illinois courts have explored the difference between liquidated damages and penalties in the contract context numerous times. They have consistently held that a liquidated damages provision is one that is intended to approximate actual damages. *See, e.g.*, *GK Dev., Inc., v. Iowa Malls Fin. Corp.*, 2013 IL App (1st) 112802, ¶ 49 (explaining the factors distinguishing between liquidated damages and penalties include whether "the amount . . . was reasonable . . . bearing some relation to the damages which might be sustained" and whether "actual damages would be uncertain in amount and difficult to prove"); *Jameson Realty Grp. v. Kostiner*, 351 Ill. App. 3d 416, 423 (1st Dist. 2004) (same); *see also Smart Oil,* 970 F.3d at 863 (7th Cir. 2020) (explaining that liquidated damages must "bear[] some relation to the damages that might occur").

---

[7] Illinois courts have adopted and relied upon this exact provision of the Restatement (Second) of Contracts. *See, e.g.*, *Penske Truck Leasing Co., L.P. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 454 (5th Dist. 2000).

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

Against this backdrop, the General Assembly chose to have the Privacy Act provide for liquidated damages. The General Assembly could have chosen to impose a penalty. It did not. It could have chosen to provide for statutory damages. It did not. The General Assembly's choice is a clear indication of its intent that damages should closely approximate actual damages. Dissent ¶ 63 ("nor did the legislature intend to impose damages wildly exceeding any remotely reasonable estimate of harm"). Surely, in the situation presented here—and the vast majority of other Privacy Act cases—where no data breach or misuse of biometrics is alleged, billions in damages is not an approximation of actual injury. *Id.* ¶ 63 ("[T]he statute's provision of liquidated damages between $1000 and $5000 is itself evidence that the legislature did not intend to impose ruinous liability on businesses."). Accordingly, the Opinion cannot be reconciled with the General Assembly's choice to ensure that recovery for violations of the Act must bear some relation to damages that may actually occur.

### C.   By Providing for Attorneys' Fees, the General Assembly Signaled Its Expectation That Claims Would Be Small.

The General Assembly also made clear its intention that the Act should not be construed to provide for excessive damages when it provided for attorneys' fees and costs. Illinois follows the American Rule, which prohibits prevailing parties from recovering their attorneys' fees from the losing party, absent express statutory or contractual provisions. *Morris B. Chapman & Assocs., Ltd. v. Kitzman,* 193 Ill. 2d 560, 572 (2000). The United States

18

Supreme Court described the purposes of the American Rule as follows: "[S]ince litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and [that] the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967), *superseded by statute on other grounds in Nightengale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958 (7th Cir. 2010). When the General Assembly elects to provide for statutory attorneys' fees, it does so in circumstances where these policy considerations are reversed, including when damages are limited and absent recovery of attorneys' fees, parties might be discouraged from bringing a claim to vindicate their rights.

By way of example, the General Assembly has provided for a prevailing employee to recover attorneys' fees in wage actions where the amount of wages sought "is justly due and owing, and [ ] a demand was made in writing at least 3 days before the action was brought, for a sum not exceeding the amount so found due and owing." 705 ILCS 225/1. Similarly, the General Assembly allows lessees to recover attorneys' fees from lessors for both the failure to supply the statement required by the Security Deposit Return Act (765 ILCS 710/1) and the refusal to pay interest on a security deposit (765 ILCS 715/1).

The General Assembly also commonly provides for attorneys' fees in statutes, like the Privacy Act, which provide for the greater of actual damages

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

or a small amount of liquidated damages. *See*, *e.g.*, 410 ILCS 513/40(a) (providing for liquidated damages of $2,500 or $15,000 and attorneys' fees and costs for violations of the Genetic Information Privacy Act); 410 ILCS 305/13 (providing for liquidated damages of $2,000 or $10,000 and attorneys' fees for violations of the AIDS Confidentiality Act); 50 ILCS 355/5-60(d) (providing for liquidated damages of $5,000 or $10,000 and attorneys' fees and costs for violations of the Local Government Revenue Recapture Act); 625 ILCS 5/6-117.1 (providing for liquidated damages of $250 and attorneys' fees and costs for the misuse of driver's license information); 225 ILCS 510/14.3 (providing for liquidated damages of $1,500 and attorneys' fees and costs for violations of the contract provisions in the Nurse Agency Licensing Act).

Each of the above examples involves a situation where the policies underlying the American Rule are inverted. Where the damages potentially at stake are minimal, such when a lessor refuses to pay interest on a security deposit, an individual would be discouraged from bringing an action, and an attorney would be disincentivized to take on the action, absent the ability to recover statutory attorneys' fees. As illustrated by these statutes, the very purpose of statutory fee-shifting is to encourage clients and lawyers to bring claims that otherwise would not be worth the time and effort.

In contrast, where damages are potentially massive, as under the Opinion's interpretation of the Privacy Act, the policies underlying the American Rule are directly implicated. If a single individual plaintiff can

20

recover millions, there is ample incentive for plaintiffs to bring Privacy Act claims and there would be no shortage of lawyers to represent them on a contingent-fee basis.  Meanwhile, Defendants faced with potentially colossal liability would be disincentivized from aggressively defending themselves if they were also faced with the additional burden of paying for the plaintiff's lawyer.

The General Assembly was certainly aware of these policy concerns when choosing to provide attorneys' fees to a plaintiff who prevails in a Privacy Act action.  The General Assembly's choice to provide for attorneys' fees—like its choice to provide for liquidated damages only to those aggrieved under the Act—demonstrates that it never intended the damages to escalate in the manner resulting from per-scan claim aggregation.

## III.     The Court Has Overlooked Constitutional Problems That Directly Arise From Its Holding.

Reconsideration is also warranted because the Opinion creates serious constitutional problems.  *See* Dissent ¶ 60 (the Court has a duty to consider the "consequences of construing the Act one way or another").  Specifically, the Court should reconsider its holding in light of both the vagueness doctrine and the constitutional avoidance doctrine.  The Opinion renders the Act's liquidated damages provision impermissibly vague and constitutionally infirm by creating a discretionary standard for imposing damages—damages that could be ruinous—without any standards or guideposts to cabin that discretion.  Further, the Court should consider the constitutional avoidance

21

doctrine because the Opinion embraces damages awards it describes as "potentially excessive" (Opinion at ¶ 43) and "harsh, unjust, absurd, or unwise" (Opinion at ¶ 41 (internal quotation marks omitted)), while overlooking the Due Process consequences that unfettered damages awards create.

### A.    The Opinion Renders the Privacy Act's Liquidated Damages Constitutionally Infirm Under the Due Process Clause and the Void for Vagueness Doctrine.

As the Privacy Act stands in light of the Opinion, its scheme for imposing liquidated damages is constitutionally void for vagueness.  Due process requires states like Illinois to provide meaningful standards to guide the application of its laws.  *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983).  A statute that lacks such standards is void.  *Id.* at 361.

A statute is impermissibly vague if it fails to inform potential violators "that certain conduct is prohibited, *inform them of the potential penalties that accompany noncompliance*, and *provide explicit standards for those who apply the law*."  *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1306, 1311 (11th Cir. 2009) (emphasis added) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) in applying void-for-vagueness doctrine to Fair Credit Reporting Act's statutory damages provision).  A statute cannot delegate "basic policy matters to . . . judges [and] juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Id.* at 1312 (quoting *Grayned*, 408 U.S. at 108-09).[8]  In *Giaccio v.*

_____

[8] The void-for-vagueness doctrine applies to civil as well as criminal statutes. *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966) (due process protections are

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

*Pennsylvania*, the United States Supreme Court struck down on vagueness grounds a statute that permitted juries to assess costs without any standards against acquitted criminal defendants. 382 U.S. at 401-02. The Court explained a statute may not leave "judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Id.* at 401-03.

The Opinion construes the Privacy Act in a manner that fails for precisely the same reasons. The Privacy Act does not inform a potential violator of the "potential penalties that accompany noncompliance"—penalties that can destroy a business. Nor does it provide "explicit standards" for those who apply the law. *Harris*, 564 F.3d at 1311. Under the construction in the Opinion, it does the opposite. The Opinion notes that damages "appear" to be "discretionary." *See* Opinion ¶ 42. A judge or a jury now has the discretion to award no liquidated damages or billions in damages for the same conduct. There is no guidance or criteria for who pays nothing and who suffers "annihilative liability." *See* Opinion ¶ 40. This is no "narrow, statutorily established range" for privacy violation damages. *See Harris*, 564 F.3d at 1312. The now standardless imposition of liquidated damages under the Privacy Act

---

"not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute"). The vagueness standard for civil consequences may be "less strict," but scrutiny intensifies in proportion to the severity of the penalty imposed. *Harris*, 564 F.3d at 1310-11 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982)). Here, the severity of the potential damages awards warrants heightened scrutiny.

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

is a "basic policy matter[]" that cannot be left for *ad hoc* resolution by judges and juries. *See id.* at 1310-12.

The Opinion recognizes this problem. Indeed, it concludes with a direct appeal to the legislature to "review policy concerns" and "make clear its intent" regarding the "potentially excessive damage awards" that may result from its construction. Opinion ¶ 43. This request for future clarification, however, cannot save the Privacy Act from its present vagueness. The Act, as construed in the Opinion, is impermissibly vague and a rehearing on this issue is warranted.

At minimum, White Castle respectfully requests that the Court clarify paragraphs 40 through 43 of the Opinion and provide guidance regarding the imposition of Privacy Act damages. These paragraphs highlight the conflicts that result from the Opinion's accrual construction: Section 20 permits recovery for "each violation"; damages "appear" to be discretionary; class members should be compensated and future violations deterred "without destroying defendant's business"; and policy concerns exist over "excessive damages awards." Opinion ¶¶ 40-43. There are no current standards to impose damages under the Privacy Act, and absent clarification, the constitutional issues discussed above loom large and warrant a rehearing.

**B.    The Court Should Consider the Due Process Implications of Its Holding.**

Rehearing is also warranted because the Opinion overlooks the constitutional avoidance doctrine. White Castle discussed the doctrine in its

24

Opening Brief and explained that excessive Privacy Act damages create constitutional issues under the Due Process Clause of the United States Constitution and similar protections in the Illinois Constitution. Opening Br. at 42-46.

The Court must construe the Privacy Act in a manner that promotes the Act's purpose while avoiding, if possible, "a construction that would raise doubts as to its validity." *People v. Glenn*, 2018 IL App (1st) 161331, ¶ 22 (citing *People v. Nastasio*, 19 Ill. 2d 524, 529 (1960)). If a statute's construction is doubtful, the Court must "resolve the doubt in favor of the statute's validity." *Bonaguro v. Cnty. Officers Electoral Bd.*, 158 Ill. 2d 391, 397 (1994) (citation omitted). "Surely the potential imposition of crippling liability on businesses is a proper consequence to consider." Dissent ¶ 62.

On its face, the Opinion's construction results—at a minimum—in constitutional doubt. The Opinion initially overlooks these constitutional concerns because it found the Act's language "clear" and as a result, the language "must be given effect." Opinion ¶ 40. At the same time, however, the Opinion recognizes its construction—potentially resulting in $17.1 billion in liability for one defendant alone—"may be harsh, unjust, absurd or unwise." *Id.* (citation and internal quotation marks omitted). Indeed, the Opinion imposes per scan claim accrual despite *Plaintiff's* Counsel arguing against this outcome at oral argument because of the potential constitutional issues

25

created: "I think there are limitations on due process, on constitutional questions . . . ." Oral Argument Tr. at 25:9-25 (May 17, 2022).

The Court must presume the General Assembly intended to enact constitutional legislation (*Bonaguro*, 158 Ill. 2d at 397), but the Opinion does not presume as much in finding the Privacy Act's language "clear" while also requesting clarification of legislative intent to avoid resulting in excessive, absurd, unjust, unwise, and likely unconstitutional, damages. *See* Opinion ¶ 43. Through its own appeal to the legislature, discussed above, the Opinion acknowledges that its Privacy Act construction will result in unconstitutional damages.

Under the constitutional avoidance doctrine, the Court must consider these severe consequences and construe the Privacy Act so as to "affirm [its] constitutionality and validity, if reasonably possible." *Glenn*, 2018 IL App (1st) 161331, ¶ 22; Dissent ¶ 61 ("the majority's construction of the Act could easily lead to annihilative liability" (quoting *People v. Shephard*, 152 Ill. 2d 489, 499 (1992)). Here, it is more than reasonably possible. As discussed above, first-use accrual is consistent with the Privacy Act's plain language and this Court's precedent in *Rosenbach*. The Court should consider its duties to presume that the General Assembly intended the Privacy Act to be constitutional and to interpret the Act in a way that avoids constitutional problems. This issue warrants reconsideration as well.

26

## **CONCLUSION**

For the foregoing reasons, White Castle respectively requests that the

Court vacate the Opinion and grant rehearing.


Dated:  March 10, 2023          Respectfully submitted,

                                **WHITE CASTLE SYSTEM, INC.**

                                By:  */s/ Melissa A. Siebert*

                                Melissa A. Siebert
                                Erin Bolan Hines
                                **COZEN O'CONNOR**
                                123 N. Wacker Drive, Suite 1800
                                Chicago, Illinois 60606
                                Tel:  (312) 382-3100
                                Email:  msiebert@cozen.com
                                       ebolanhines@cozen.com


                                ***Counsel for Defendant-Appellant***
                                ***White Castle System, Inc.***

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Supreme Court Rule 341(c), I certify that this Petition for Rehearing conforms to the requirements of Rules 367, 341(a) and (b). The length of this Petition, excluding the pages containing the Rule 341(d) cover, the Rule 341(c) certificate of compliance, the certificate of service, and those matters contained in the appendix, if any, is 27 pages.

<u>/s/ Melissa A. Siebert</u>
Melissa A. Siebert

SUBMITTED - 21815895 - Melissa Siebert - 3/10/2023 12:29 PM

**NOTICE OF FILING and PROOF OF SERVICE**

In the Supreme Court of Illinois

| | | |
|---|---|---|
| LATRINA COTHRON, | ) | |
| | ) | |
| *Plaintiff-Appellee,* | ) | |
| | ) | |
| v. | ) | No.    128004 |
| | ) | |
| WHITE CASTLE SYSTEM, INC., | ) | |
| | ) | |
| *Defendant-Appellant.* | ) | |

The undersigned, being first duly sworn, deposes and states that on March 10, 2023, there was electronically filed and served upon the Clerk of the above Court the Petition for Rehearing. On March 10, 2023, service of the Petition will be accomplished via the filing manager, Odyssey EfileIL, to the following counsel of record:

Ryan F. Stephan (rstephan@stephanzouras.com)
James B. Zouras (jzouras@stephanzouras.com)
Andrew C. Ficzko (aficzko@stephanzouras.com)
Teresa Marie Becvar (tbecvar@stephanzouras.com)
STEPHAN ZOURAS, LLP

Within five days of acceptance by the Court, the undersigned states that thirteen copies of the Petition bearing the court's file-stamp will be sent to the above Court.

*/s/ Melissa A. Siebert*
Melissa A. Siebert

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

*/s/ Melissa A. Siebert*
Melissa A. Siebert